CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

09/30/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| JEFFREY S.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 3:18-cv-00028 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| ANDREW M. SAUL, | ) | By: Joel C. Hoppe |
| Commissioner of Social Security | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Jeffrey S. asks this Court to review the Commissioner of Social Security's final

decision denying his applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42

U.S.C. §§ 401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C.

§ 636(c). ECF Nos. 9, 10. Having considered the administrative record, the parties' briefs, and

the applicable law, I find that the Commissioner's decision is supported by substantial evidence

and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it

may not "reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby
substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this
action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In September 2014, Jeffrey filed for DIB and SSI alleging that he was disabled because of anxiety disorder, stroke, Hepatitis C, nerve damage, and problems with his neck, back, hip, and knee. *See* Administrative Record ("R.") 24, 67–68, 79–80, 206–07, 208–22, ECF No. 13. He was fifty years old, or a person "closely approaching advanced age" under the regulations, when he allegedly became disabled in April 2014. R. 33, 67, 79; 20 C.F.R. §§ 404.1563(d), 416.963(d). Disability Determination Services ("DDS"), the state agency, denied his claims initially in January 2015, R. 65–90, and upon reconsideration that August, R. 91–124. In December 2016, Jeffrey appeared with counsel and testified at an administrative hearing before ALJ Mary Peltzer. R. 45–59. A vocational expert ("VE") also testified at this hearing. R. 60–63.

ALJ Peltzer issued an unfavorable decision on March 30, 2017. R. 24–34. She found that Jeffrey had four "severe impairments: degenerative disc disease-lumbar spine, history of left femur fracture, anxiety disorder, and major depressive disorder." R. 24. All other medical impairments referenced in the record, including noted "degenerative changes in his cervical spine and a left rotator cuff tear," were deemed non-severe. *Id.* Jeffrey's severe physical

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

impairments did not meet or equal the relevant musculoskeletal Listings primarily because he could still "ambulate effectively." R. 27 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.00, 1.02, 1.04, 1.06). His severe mental impairments did not meet or equal the relevant Listings because they caused "no limitations" in his capacities for "adapting and managing" himself; overall "mild limitations" in "understanding, remembering, or applying information" and "concentrating, persisting, or maintaining pace"; and "no more than moderate limitations" in "interacting with others." R. 28 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.06(B) (2017)).

ALJ Peltzer then evaluated Jeffrey's residual functional capacity ("RFC") and found that he could do "light work"[4] with additional limitations:

> [O]ccasional stairs and ramps; no ladders, ropes, and scaffolds; frequent stooping; occasional kneeling, crouching, and crawling; occasional exposure [to] workplace hazards such as dangerous moving machinery, but no exposure to unprotected heights. He can perform unskilled work at an SVP 1 or 2 involving simple, routine tasks with no contact with the general public and occasional contact with supervisors and coworkers, with no tandem work assignments.

R. 29. The limitation to "unskilled" work ruled out Jeffrey's return to his past relevant work. R. 32–33. Finally, based on this RFC finding and the VE's testimony, ALJ Peltzer concluded at step five that Jeffrey was not disabled because he still could perform certain light, unskilled occupations (marker, inspector/grader) that offered a significant number of jobs in the national economy. R. 34. The Appeals Council denied Jeffrey's request for review, R. 1–3, and this appeal followed.

## III. Discussion

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

Jeffrey challenges ALJ Peltzer's determination of his RFC, arguing the ALJ failed to accord proper weight to the medical opinion of his treating physician, Zeljko Stjepanovic, M.D., regarding his physical limitations and instead gave greater weight to the DDS physicians who did not examine him. *See generally* Pl.'s Br. 15–20. Jeffrey further challenges the weight ALJ Peltzer gave to the opinion of his "treating" nurse practitioner Nancy Hussar, L-QMHP, regarding his mental limitations because she gave greater weight to one of the DDS psychiatrists who did not examine him. *Id.* at 20–25. His arguments are not persuasive.

*

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and related symptoms.[5] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect any credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms," including pain, that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See*

---

[5] "Symptoms" are the claimant's own description of his medical condition. 20 C.F.R. §§ 404.1528(a), 416.928(a). The regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *See Lewis*, 858 F.3d at 865–66. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce," *id.* at 866, the actual pain or other symptoms "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. The ALJ must give specific reasons supported by "references to the evidence" for the weight assigned to those statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013), and, when necessary, she should "explain how [s]he decided which . . . statements to believe and which to discredit," *Mascio*, 780 F.3d at 640.

*Mascio*, 780 F.3d at 638–40; *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at \*6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The ALJ has broad (but not unbounded) discretion to determine whether an alleged symptom or functional limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in the claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at \*5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 267–72 (4th Cir. 2017), and her written decision built an "accurate and logical bridge from that evidence to [her] conclusion" that the claimant is not disabled, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and other brackets omitted).

A.    *Summary*

    1.    *Treatment Notes*

In July 2010, Jeffrey was diagnosed with degenerative disc disease and an "[o]ld fracture deformity" in his left femur. R. 406–07, 411–12. Jeffrey continued to work until April 2014, and the record does not indicate that he received treatment for these conditions until the fall of 2014, when he established care at Dr. Stjepanovic's clinic, the Ailment Wellness Center. *See* R. 210, 402–03, 404–05. Dr. Stjepanovic saw Jeffrey about once a month through November 2016. *See* R. 402–03, 404–05, 453–59, 589–98, 600–06, 665–68. Jeffrey consistently reported back pain or tenderness and knee, leg, and hip pain. *See, e.g.*, R. 402, 404–05, 455–59, 589–91, 603–06, 665–68. Dr. Stjepanovic prescribed Methadone and Oxycodone for Jeffrey's pain. *See id.* After April 2014, Jeffrey repeatedly stated that his pain was well controlled on medications. *See, e.g.*, 415,

417, 453–54, 458, 589–90, 592–93, 595, 598–99, 601, 668. Jeffrey's gait, station, and extremity strength were generally normal on physical exams. *See, e.g.*, R. 566, 573, 620. In August 2016, Dr. Stjepanovic assessed Jeffrey with lumbar foraminal narrowing. R. 665–68.

Dr. Stjepanovic completed a Residual Functional Capacity Questionnaire for Jeffrey on June 16, 2015. R. 466–68. Dr. Stjepanovic had treated Jeffrey since September 10, 2014. R. 468. He diagnosed Jeffrey with osteoarthritis, degenerative disc disease, lumbago, and status-post left femur reconstruction and stated that Jeffrey's prognosis was "fair." R. 466. Jeffrey's symptoms included lower back pain and "pain in [the] right arm," which "often" would be "severe enough to interfere with the attention and concentration required to perform simple work-related tasks." *Id.* As for his specific limitations, Dr. Stjepanovic opined that Jeffrey could walk five city blocks "without rest or significant pain"; sit for forty-five minutes at one time, and for six hours total in an eight-hour workday; "stand/walk" for thirty minutes at one time and for six hours total in an eight-hour workday; and frequently lift ten pounds, occasionally lift twenty pounds, but never lift fifty pounds. R. 466–67. Jeffrey was not "physically capable of working an 8 hour day, 5 days a week . . . on a sustained basis," R. 476, in part because he needed to take "2 or 3" unscheduled thirty-minute breaks during a typical workday, R. 466. He would also miss work "three or four times a month." R. 467. Dr. Stjepanovic opined that Jeffrey's limitations related back to 2010. R. 468.

In June 2015, Brian Krause, M.D., diagnosed Jeffrey with major depressive disorder (recurrent, moderate), opioid abuse, and general anxiety disorder. R. 476. Prior to his diagnosis, Jeffrey was treated with Xanax, prescribed by providers at the pain management clinic. R. 402–05, 455–59. After he stopped working, Jeffrey reported depression, anxiety, and worry, R. 378–79, 479, 536, 634, 639; trouble concentrating, R. 378; and difficulty sleeping or eating, R. 479,

494. He also stated his "nerves are shot," "he just can't handle things anymore," he had a "racing mind," and he does not like being around crowds of people, R. 494, 639.

In May 2015, Jeffrey reported to Rappahannock-Rapidan Community Services ("RRCS") for treatment of his mental health problems. *See* R. 488–99. Jeffrey's initial assessment was conducted by Guy Lushin, L.C.S.W., who noted that Jeffrey's thought processes exhibited perseveration and were "circumstantial and tangential." R. 488 (spelling corrected). Jeffrey's appearance, behavior, and cognition were appropriate, he had normal speech, and his mood and affect were "depressed, anxious." *Id.* Mr. Lushin recommended individual or group therapy and medication management. R. 493. Subsequently, Jeffrey saw Mary Fisher, C.N.S., and Nancy Hussar, N.P., for his care at RRCS. Nurse Fisher observed that Jeffrey had a cooperative attitude, "logical/organized" thought processes, a euthymic or anxious appearance, intact memory, good or limited insight, and good or fair judgment and insight. R. 471, 483. Jeffrey saw NP Hussar six times in ten months. R. 610, 617, 634, 639, 644, 653. She sometimes observed that Jeffrey's mood was anxious or depressed, R. 617, 644, 653, but she also regularly observed that Jeffrey's mood was euthymic, R. 610, 634, 639. Jeffrey's thought processes were "logical/organized," R. 610, 617, 634, 639, 644, 653, although he sometimes exhibited perseveration and circumstantial or tangential thoughts, R. 617, 634, 639, 644, 653. He was always "cooperative" and had "intact" memory in all spheres. R. 610, 617, 634, 639, 644, 653. NP Hussar observed that Jeffrey had "fair" judgment and insight and "limited" insight. *Id.* Several other providers, including Dr. Stjepanovic, also noted normal psychological examinations throughout the relevant period. *See, e.g.*, R. 378–80, ,430, 453–59, 558, 563, 566, 574, 586, 589–99, 601, 602–06, 665–68, 671.

On November 2, 2016, NP Hussar completed a Mental Capacity Assessment form giving her opinions of Jeffrey's limitations in understanding and memory, sustained concentration and

persistence, social interaction, and adaptation. R. 660–62. Jeffrey had "extreme" limitations in his ability to understand and remember detailed instructions, but only "moderate" limitations in his ability to remember locations and work-like procedures. R. 660. Jeffrey had "moderate" limitations in his ability to make simple work-related decisions; "marked" limitations in his ability to carry out very short and simple instructions; and "extreme" limitations in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, maintain a regular schedule and routine, work with others without distraction, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace with a standard number of breaks. R. 660–61. Asked to "[d]escribe the medical/clinical findings that support[ed]" these limitations in concentration and persistence, NP Hussar wrote that Jeffrey "require[d] breaks every 15 minutes [due to his] COPD." R. 661. Jeffrey also had "slight" limitations in his abilities to interact appropriately with the general public; "moderate" limitations in his abilities to ask simple questions or request assistance and to get along with coworkers without distracting them or exhibiting behavioral extremes; and "extreme" limitations in his ability to accept instructions and criticism from supervisors. *Id.* NP Hussar cited Jeffrey's "[d]ifficulty sleeping [and] report[ed] 'head spinning'" as the "medical/clinical findings that support[ed]" her assessment of his social interaction ability. *Id.* Finally, NP Hussar opined that Jeffrey had "marked" limitations in his ability to set realistic goals or make plans independently and "extreme" limitations in his ability to respond appropriately to workplace changes. R. 662.

   2.   *DDS Medical Opinions*

   Carolina Bacani-Longa, M.D., and Patricia Staehr, M.D., reviewed Jeffrey's medical records for DDS in December 2014 and August 2015, respectively. R. 73–76, 85–88, 102–04,

118–20. Dr. Bacani-Longa opined that Jeffrey's "degenerative changes of [the] lumbar spine and history of [resolved] mononeuropathy in the right hand" warranted restricting him to "medium" work with additional postural limitations. R. 74–77, 86–89. More specifically, Jeffrey could occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds; use his arms or legs to push/pull without limitation up to the weights and frequencies for lift/carry; sit and stand and/or walk for about six hours each during an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and frequently climb ramps/stairs, stoop, kneel, crouch, and crawl. R. 74–75, 86–87. He should "avoid concentrated exposure" to extreme cold. R. 75, 87. Dr. Staehr affirmed Dr. Bacani-Longa's assessment. R. 103–04, 119–20. Dr. Staehr attributed Jeffrey's exertional and postural limitations to "degenerative changes of [his] lumbar spine, chronic pain well-controlled with current treatment, and history of radial mononeuropathy in the right hand which resolved." *Id.* Dr. Staehr also noted that although Jeffrey had a seizure since the last assessment, it was due to "withdrawal [when he] abruptly stopped his Xanax [and] narcotic med[ications]" and Jeffrey had "[n]o other seizure history." R. 104, 120.

David Deaver, Ph.D., and Jo McClain, Psy.D., also reviewed Jeffrey's medical records for DDS in December 2014 and August 2015, respectively. R. 72–73, 84–85, 101, 104–06, 117, 120–22. Dr. Deaver found that Jeffrey's affective disorder and substance addiction disorder were "non-severe." R. 72, 84. He opined that Jeffrey "would be capable of all levels of work" despite his "diagnosis of anxiety" because his mental status exams and daily activities were "not significantly limited." R. 73, 85. Dr. McClain opined that Jeffrey's "severe" anxiety and depression caused "mild" restrictions in activities of daily living and "moderate" difficulties in social functioning and maintaining concentration, persistence, or pace. R. 101, 117. More specifically, Jeffrey had "moderate" limitations in his abilities to carry out detailed instructions,

to maintain attention and concentration for extended periods, to "complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number of breaks," but he still could perform simple, routine tasks. R. 105, 120–21; *see* R. 31, 61. Jeffrey had "moderate" limitations in his abilities to interact appropriately with the general public, accept instructions and criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 105, 121. Dr. McClain opined that Jeffrey's "[a]nxiety and depression would limit him to work with modest social demands." *Id.*

  *3.  Jeffrey's Statements*

   Jeffrey alleged that he could not work after April 2, 2014, because of back, neck, hip, and knee problems, anxiety, stroke, hepatitis C, and nerve damage. R. 210, 236–37. At the hearing before ALJ Peltzer in December 2016, Jeffrey testified that he could not work because he "can't do anything anymore." R. 50. Regarding his physical limitations, Jeffrey testified that his "back is always hurting [him] lifting [a] heavy box" and that he could not "straighten up." R. 52. He could sit for "10, 15, [or] 20" minutes before he had to get up and walk around to relieve his lower back pain. *Id.* He could walk "[p]robably a good two blocks" before needing to stop and rest because of his COPD. He could lift "maybe 35 pounds at the most." R. 53–54. Regarding his mental limitations, Jeffrey testified that he was "tired all the time" and his "brain is constantly just going." R. 50, 57. He also testified that he gets "really bad . . . anxiety attacks" caused by being "in places with a lot of people" and he could not "go into Walmart" because he "feel[s] boxed in." R. 51.

  *B.  The ALJ's Decision*

ALJ Peltzer considered this evidence throughout her written decision. R. 24–34. She found that Jeffrey's lumbar degenerative disc disease, history of left femur fracture, anxiety disorder, and major depressive disorder could reasonably be expected to cause his chronic pain and mental health symptoms, but that Jeffrey's statements concerning "the intensity, persistence, and limiting effects" of those symptoms were "not entirely consistent" with the objective medical evidence and other relevant evidence in his record. R. 29; *see* R. 30.

The ALJ rejected Jeffrey's statements regarding the extreme severity of his chronic physical pain because he was diagnosed with degenerative disc disease and broke his left femur several years before his alleged onset date of disability and he was able to work with those conditions, he had received minimal treatment, and his physical examinations were normal. R. 29–30 (citing R. 345, 573, 620). Additionally, she noted Jeffrey reported that medication and moving around helped with his pain. R. 30 (citing R. 54, 597). ALJ Peltzer also rejected Jeffrey's testimony that his anxiety and major depressive disorder kept him from working because his treatment notes revealed normal psychological examinations. *Id.* (citing R. 430, 459, 543, 607, 668).

The ALJ gave "partial" weight to the DDS physicians' opinions that Jeffrey could perform "medium" work because neither doctor examined Jeffrey and the record as a whole, including Jeffrey's testimony, showed that he was "more properly limited to a range of light work." R. 31 (citing R. 46–59, 345, 406–07, 472, 573, 597, 620, 680). She gave "limited" weight to Dr. Stjepanovic's June 2015 assessment because he stated that his "opinion extended back to 2010, even though he did not start treating [Jeffrey] until September 2014" and he "did not explain why [Jeffrey] would be expected to miss 3–4 days of work per month." *See* R. 31–32 (citing R. 466–68). She further found that "the severe limitations in standing and walking [were]

inconsistent with the medical evidence, which reveal[ed] normal physical examinations and that [Jeffrey] walk[ed] with a normal gait." R. 32 (citing R. 345, 573, 620).

The ALJ gave "great" weight to Dr. McClain's opinion that Jeffrey could "perform simple, routine tasks" because it was "consistent with the medical evidence of the record and the normal mental examinations throughout the period at issue." R. 31. (citing R. 379, 430, 459, 494, 543, 586, 607, 634, 668). The ALJ gave "partial" weight to the opinion of NP Hussar. R. 32. The ALJ noted that NP Hussar was "not an acceptable medical source, but [she] considered her opinions in evaluating the severity of [Jeffrey's] symptoms." *Id.* The ALJ stated that NP Hussar's opinion was "inconsistent with the medical evidence, which consistently report normal mental examinations, and that [Jeffrey] has denied experiencing anxiety and depression on multiple occasions throughout the period at issue." *Id.* (citing R. 379, 430, 459, 494, 543, 586, 607, 634, 668). The ALJ also noted that NP Hussar "based her most extreme limitations on [Jeffrey's] COPD, explaining that [Jeffrey] could not maintain pace and persistence because he required breaks every 15 minutes due to his COPD, which is entirely inconsistent with the medical evidence." *Id.* (citing 677).

C.    *Analysis*

Jeffrey first argues that ALJ Peltzer's RFC assessment is unsupported by substantial evidence because she did not accord proper weight to Dr. Stjepanovic's treating source medical opinion. *See* Pl.'s Br. 16–19. Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1). The ALJ must adequately explain the weight afforded to each medical opinion in the claimant's record, taking

into account relevant factors such as the nature and extent of the physician's treatment relationship with the claimant; how well the physician explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the physician's area of specialty. *Id.* §§ 404.1527(c), 416.927(c).

Jeffrey argues that ALJ Peltzer misapplied the "treating physician rule," *see* Pl.'s Br. 15–19, which sets out a special standard for ALJs to evaluate medical opinions from physicians who are "likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's impairments, 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating source's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give a treating source medical opinion controlling weight, then she must consider the five regulatory factors "to determine what lesser weight should instead be accorded the opinion." *Brown*, 873 F.3d at 256; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "The regulation promises that the ALJ 'will always give good reasons in [the] decision for the weight'" assigned to a "'treating source's medical opinion.'" *Brown*, 873 F.3d at 256 (quoting 20 C.F.R. § 404.1527(c)(2)).

Jeffrey also objects that the ALJ gave greater weight to the DDS physicians' opinions, even though they did not examine him. An ALJ may rely on a non-examining source's medical opinion

> [W]here that opinion has sufficient indicia of "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion."

*Woods*, 888 F.3d at 695 (quoting *Brown*, 873 F.3d at 268); *see* 20 C.F.R. §§ 404.1527(c)(3),

416.927(c)(3). A reviewing court "must defer to the ALJ's assignment of weight" among

differing medical opinions unless her underlying findings or rationale "are not supported by

substantial evidence" in the record. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015); *see*

*also Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016).

ALJ Peltzer recognized the treating relationship between Jeffrey and Dr. Stjepanovic. R.

32. She did not summarily reject Dr. Stjepanovic's opinion, but gave three reasons for assigning

his opinion "limited weight": (1) "Dr. Stjepanovic did not explain why [Jeffrey] would be

expected to miss 3–4 days of work per month"; (2) "his opinion extended back to 2010, even

though he did not start treating [Jeffrey] until September 2014"; and (3) "the severe limitations in

standing and walking [were] inconsistent with the medical evidence, which reveal[ed] normal

physical examinations, and that [Jeffrey] walks with a normal gait." R. 31–32 (citing R. 345,

573, 620). Jeffrey objects only to the third reason, asserting that ALJ Peltzer "mischaracterized

the quality and nature" of his "subjective complaints, the examination findings, and the available

imaging studies." Pl.'s Br. 17.

Dr. Stjepanovic's opinion that Jeffrey could sit and stand/walk for six hours each in an

eight-hour workday, frequently lift and carry ten pounds, and occasionally lift twenty pounds, R.

466–67, matched ALJ Peltzer's RFC findings that Jeffrey was restricted to "light" work, R. 29,

31, 103. *See* SSR 83-10, 1983 WL 31251, at *5–6 (noting that light work typically requires a

total of six hours of standing and/or walking during a normal eight-hour workday). The only

portion of the assessment that was arguably inconsistent with "light work" was Dr. Stjepanovic's

opinion that Jeffrey could stand/walk for thirty minutes at a time. R. 466. ALJ Peltzer rejected

this "severe limitation[]" because it was "inconsistent with the medical evidence, which

reveal[ed] normal physical examinations, and that [Jeffrey] walks with a normal gait." R. 32

(citing R. 345, 573, 620). In December 2013, Jeffrey's gait was "normal." R. 345. In 2016,

Jeffrey's physical exams showed normal strength, no issue with straight leg raising, and a normal

gait. *See* R. 566, 573, 620.[6] The weight ALJ Peltzer assigned Dr. Stjepanovic's treating source

medical opinion and the portion of his assessment that she rejected are supported by substantial

evidence in the record and survive the "deferential standard of review." *Dunn*, 607 F. App'x at

271. *See, e.g.*, R. 27 (Jeffrey "is able to ambulate effectively"), R. 566, 573, 620.

Jeffrey also argues that ALJ Peltzer gave the DDS reviewers opinions' more weight than

Dr. Stjepanovic's treating source medical opinion. Pl.'s Br. 19. Contrary to Jeffrey's suggestion,

ALJ Peltzer afforded the DDS reviewers' opinions only "partial weight," and does not appear to

have given the DDS reviewers' opinions' more weight than Dr. Stjepanovic's opinion. In fact,

ALJ Peltzer discounted large portions of the DDS reviewers' opinions, further limiting Jeffrey

from medium to light work, "occasional stairs and ramps, [and] kneeling, crouching, and

crawling," and "no ladders, ropes, and scaffolds." R. 29, 31.

In his brief, Jeffrey cites numerous examples of when he reported back, knee, and hip

pain and tenderness to his doctors, which he believes contradicts the ALJ's characterization of

these "normal" physical examinations. *See* Pl.'s Br. 17–18 (citing R. 379, 402–05, 414–15, 417,

453–59, 483, 565, 572–73, 589–601, 603–07, 665–68, 670). A doctor's documentation of a

patient's subjective complaints in the treatment notes, however, "does not transform those

complaints into clinical evidence." *Riegel v. Colvin*, No. 7:12cv526, 2014 WL 462525, at *6

(W.D. Va. Feb. 5, 2014); *Webb v. Astrue*, 2:11cv103, 2012 WL 3061565, at *17 (N.D. W. Va.

June 21, 2012) (citing *Craig*, 76 F.3d at 590 n.2). "[G]iven the specific and legitimate reasons

---

[6] The treatment notes contain few objective observations and signs, but those that were noted are largely normal.

provided, the ALJ was permitted to reject," *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014), the portion of Dr. Stjepanovic's opinion that Jeffrey had "severe limitations" in standing and walking at one time, R. 32.

Jeffrey also argues that ALJ Peltzer's mental RFC determination is unsupported by substantial evidence because she "failed to afford appropriate weight to the licensed nurse practitioner, Nancy Hussar, the only treating opinion in the record addressing [Jeffrey's] mental impairments." Pl.'s Br. 20–21, 23–24. ALJ Peltzer gave NP Hussar's opinion "partial" weight because she was "not an acceptable medical source," the record consistently showed normal mental examinations, and her most extreme limitations were based on Jeffrey's COPD, which was inconsistent with the medical evidence. R. 32 (citing R. 379, 430, 459, 494, 543, 586, 607, 634, 668, 677). "Only 'acceptable medical sources' can be considered treating sources" whose opinions may be entitled to controlling weight. SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Nurse practitioners are not "acceptable medical source[s]," but their opinions "are important and should be evaluated on key issues such as impairment severity and functional affects, along with other evidence in the file." *Id.* at *2–3; *see also* 20 C.F.R. §§ 404.1513(d), 416.913(d).

ALJ Peltzer acted within her discretion to determine that portions of NP Hussar's opinion were inconsistent with the medical evidence and therefore her opinion should be afforded only "partial" weight. She did credit portions of NP Hussar's opinion. She limited Jeffrey to "unskilled work at an SVP 1 or 2 involving simple, routine tasks,"[7] R. 29, which reasonably accommodated Jeffrey's limitations in understanding, remembering, and carrying out detailed

---

[7] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). "Unskilled occupations are the least complex types of work. Jobs are unskilled when persons can usually learn to do them in 30 days or less." SSR 82-41, 1982 WL 31389, at *2 (Jan. 1, 1982).

instructions and his ability to remember work-like procedures, R. 660. She also limited Jeffrey to "no contact with the general public and occasional contact with supervisors and coworkers with no tandem work assignments," R. 29, which reasonably accommodated Jeffrey's limitation in his ability to work with others without distractions, R. 105, 121, 661.

ALJ Peltzer rejected the "extreme" limitation in Jeffrey's ability to accept instructions and criticism from supervisors because it was "inconsistent with the [objective] medical evidence," which revealed "normal mental examinations." R. 32 (citing R. 379, 430, 459, 494, 543, 586, 607, 634, 668); *see* R. 661. The ALJ's decision is reasonable because the records show that Jeffrey was "pleasant" and always "cooperative" at his mental examinations and did not report having serious difficulty with supervisors and authority figures. *See* R. 434, 444, 471, 483, 610, 617, 634, 639, 644, 653. ALJ Peltzer also rejected the "extreme" limitations in Jeffrey's sustained concentration and persistence because they were "entirely inconsistent with the medical evidence." R. 32 (citing R. 677); *see* R. 660–61. The ALJ's decision is reasonable because the records show that although Jeffrey exhibited perseveration and tangential thoughts at times, R. 498, 610, 639, his thought processes were always "logical/organized," he had "intact" memory in all spheres, and "appropriate" cognition. *See* R. 380 427, 471, 479, 483, 488, 586, 610, 617, 634, 639, 644, 653, 671. Moreover, NP Hussar based these limitations on Jeffrey's COPD, but offered no psychologically based medical or clinical evidence to support her opinion. R. 661. It is entirely reasonable for the ALJ to reject NP Hussar's extreme mental limitations because she supported her opinion with evidence of a physical condition. *Cf. Tyrpak v. Astrue*, 858 F. Supp. 2d 872, 885 (N.D. Ohio 2012) (upholding the ALJ's decision to discount a treating psychiatrist's opinion "because it stemmed largely from Plaintiff's physical condition rather than from psychiatric/psychological conditions, which was Dr. Ranjan's area of expertise."). Having

provided logical reasons, ALJ Peltzer's rejection of these extreme limitations is supported by substantial evidence in the record and survives the "deferential standard of review." *El v. Colvin*, No. 3:12cv637, 2013 WL 3446654, at *5–6 (W.D.N.C. July 9, 2013). The ALJ "met [her] burden of explanation by clearly stating that [she] gave" partial weight to NP Hussar's opinion because it was not consistent with the medical record. "Accordingly, the Court finds that the ALJ properly considered [NP Hussar's] opinions and provided appropriate explanation regarding why [she] accorded her opinion[]" partial weight. *El*, 2013 WL 3446654, at *5.

Jeffrey further argues that ALJ Peltzer erred in affording Dr. McClain's opinion more weight than that of NP Hussar's. Dr. McClain opined that Jeffrey had "moderate" limitations in his ability to sustain concentration and pace because of his "anxiety and depression," but that he would be able to perform simple routine tasks. R. 105, 121. She also opined that Jeffrey had "moderate" limitations in social interaction abilities because his "anxiety and depression would limit him to work with modest social demands." R. 105, 121. ALJ Peltzer gave Dr. McClain's opinion "great weight" because she "is familiar with the Social Security program and [her] opinion is consistent with the medical evidence of the record and the normal mental examinations throughout the period at issue." R. 31 (citing 379, 430, 459, 494, 543, 586, 607, 634, 668). She limited Jeffrey to "unskilled work at an SVP 1 or 2 involving simple, routine tasks with no contact with the general public and occasional contact with supervisors and coworkers, with no tandem work assignments," which is consistent with Dr. McClain's assessment of Jeffrey's limitations. R. 29. ALJ Peltzer acted within her discretion to give "great weight" to Dr. McClain's opinion because she "provide[d] supporting explanations" for her opinion and her opinion was consistent "with the record as a whole." 20 C.F.R. §§ 404.1527(c)(3)–(4), 416.927(c)(3)–(4). As discussed above, the ALJ reasonably determined that

exam findings were mostly normal, and where signs of moderate limitations were noted, such as in interacting with others, the ALJ reasonably accommodated those limitations. Thus, the ALJ's reliance on Dr. McClain's opinion is supported by substantial evidence.

ALJ Peltzer stated that she considered the entire record when she determined that Jeffrey was capable of light, unskilled work with some additional limitations. R. 29. "[A]bsent evidence to the contrary, [I] take her at her word." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Jeffrey does not identify any reversible error in ALJ Peltzer's RFC analysis or "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of [his] disability claim." *Id.* (emphasis omitted). Instead, he urges the Court to reweigh the same medical exhibits that ALJ Peltzer considered, R. 27–30, and to conclude that the ALJ should have found him disabled by back pain and anxiety and depression. *See generally* Pl.'s Br. 17–18, 22–23 (citing R. 403–05, 415, 453–59, 483, 488–99, 565, 572–74, 586, 589–601, 603–06, 610, 617, 634, 639, 653 665–668, 670). The Court's role here is "to determine whether the ALJ's decision is supported as a matter of fact and law." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). It "cannot simply look at the same evidence and reverse the ALJ on the basis that it could have reached a different result." *Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017). ALJ Peltzer's decision and rationale are supported by substantial evidence and therefore the decision should be affirmed.

## IV. Conclusion

For the foregoing reasons, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 21, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send copies of this Memorandum Opinion to the parties.

ENTER: September 30, 2019

Joel C. Hoppe
United States Magistrate Judge